CYNTHIA A. CONARD,

Plaintiff,

v.                                               · **Civil Action No. 2:06CV4**
                                                 **(The Honorable Robert E. Maxwell)**

JO ANNE B. BARNHART,
**Commissioner of Social Security,**

Defendant.

**REPORT AND RECOMMENDATION/OPINION** ⸺

Cynthia A. Conard ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security

("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security

Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of

the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision

on cross motions for summary judgment and has been referred to the undersigned United States

Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

**I. Procedural History**

Plaintiff filed applications for SSI and DIB on December 4, 2003, alleging disability since

October 15, 2003, for "bad back -- 3 slipped discs" (R. 49-52, 61, 235-41, 242-44). Plaintiff's

applications were denied at the initial and reconsideration levels (R. 28-29, 30-34, 35-36, 37-39,

233-34). Plaintiff requested a hearing, which Administrative Law Judge J. Peter Brown ("ALJ")

held on July 13, 2005, and at which Plaintiff, represented by David Furrer, Esquire, and James Ryan,

Vocational Expert ("VE"), testified (R. 253-71). On September 10, 2005, the ALJ entered a

decision finding Plaintiff had severe impairments, namely disorders of the back and affective disorders, but was not disabled because she could perform specific light jobs identified by a vocational expert (R. 17, 23, 15-26 ). On October 28, 2005, Plaintiff requested review of the ALJ's decision by the Appeals Council and submitted additional medical evidence therewith (R. 245-47, 248-52). On December 9, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-11).

## II. Statement of Facts

Plaintiff was born on November 6, 1957, and was forty-seven years old at the time of the ALJ's decision (R. 235, 256-57). Plaintiff graduated from high school in 1976 and had past relevant work as a labeler in a chicken factory and as a housekeeper in a motel (R. 67, 71). Plaintiff testified she quit her job at the chicken factory because she moved to Virginia with her fiancé and she quit her job as a housekeeper in Virginia on October 15, 2003, because she moved from that location to another location following a domestic altercation with her fiancé (R. 257-60).

On October 10, 2000, Plaintiff presented to Ann G. Allen, a nurse practitioner, for elevated blood pressure. She was diagnosed with hypertension and bronchitis. She was instructed to medicate with over-the-counter Robitussin and was provided a sample of Zestril 10mg (R. 107).

On October 31, 2000, Plaintiff returned to Nurse Practitioner Allen for her hypertension. Plaintiff stated she felt well, she had been compliant with her medication, and she had no chest pain or cough. Plaintiff was prescribed Zestoretic. Nurse Practitioner Allen noted Plaintiff's hypertension was "improved control" (R. 106).

On December 11, 2000, Nurse Practitioner Allen examined Plaintiff and noted her hypertension was "under good control" and continued Plaintiff on Zestoretic (R. 105).

2

On January 18, 2001, Nurse Practitioner Allen noted Plaintiff's blood pressure had been significantly elevated within the past two weeks. She assessed hypertension with marginal control and increased Plaintiff's dosage of Zestoretic and prescribed Prozac 20mg (R. 104).

On February 8, 2001, Plaintiff reported to Nurse Practitioner Allen that her blood pressure had been 140/80 or lower, she had no chest pain, she had experienced no shortness of breath, and she had no cough. Plaintiff reported she had fainted at work recently. Plaintiff informed Nurse Practitioner Allen that Prozac was "quite helpful" in treating her nerves. Nurse Practitioner Allen assessed hypertension, "improved control," and situational stress. She provided a refill prescription to Plaintiff for Zestoretic and Prozac and ordered a chest x-ray (R. 103).

On May 7, 2001, Plaintiff presented to Nurse Practitioner Allen for follow up for her hypertension. Plaintiff reported no chest pain, headaches, shortness of breath, or ankle edema, but she did have a dry cough. Nurse Practitioner Allen noted Plaintiff's chest x-ray was normal. Nurse Practitioner Allen recommended a CT scan of Plaintiff's chest; diagnosed "crackles with lower lobe," hypertension, and depression and anxiety. She prescribed Prozac (R. 102).

On May 15, 2001, Nurse Practitioner Allen noted she had discussed the results of Plaintiff's CT scan with her; however, the record did not contain the results thereof (R. 102).

On August 6, 2001, Plaintiff's blood pressure was noted to be 140/90 by Nurse Practitioner Allen. Plaintiff was diagnosed with hypertension, emphysema, and reaction to acute stress and was prescribed Hydrochlorothiazide, Accupril, and Prozac (R. 101, 120-121). Plaintiff did not keep her appointment with Nurse Practitioner Allen on September 4, 2001 (R. 101).

On March 21, 2002, Plaintiff's blood pressure was registered as 170/106 by Nurse Practitioner Allen (R. 101). Plaintiff was diagnosed with hypertension and prescribed Prozac and

Prinzide (R. 118).

Plaintiff's blood pressure was 138/84 on April 4, 2002 (R. 101). Nurse Practitioner Allen diagnosed "benign essential" hypertension and prescribed Prinzide and Prozac to Plaintiff (R. 116).

On July 18, 2002, Plaintiff presented to Springfield Family Medical to establish a new primary care physician. Plaintiff was examined and diagnosed with hypertension with borderline control, gastritis that was controlled with Prevacid, and musculoskeletal pain "probably from fatigue" ( R. 110).

On July 23, 2002, a x-ray was made of Plaintiff's lumbar spine, which was normal (R. 109).

Plaintiff was examined at the Hahn Medical Practices, Inc., Mineral County Medical facility. No date was recorded for the visit. She reported she had been in a physically abusive relationship with her husband in Virginia and had moved to her current residence "five days ago." She reported "known depression," hypertension, and low back pain (R. 124).

On November 19, 2003, Plaintiff returned to the Hahn Medical Practices, Inc. She reported she "[felt] better" in that her depression was improving. She was instructed to continue her current medication regimen and Prozac and HCTZ were prescribed. Plaintiff was instructed to return in one month (R. 123).

On December 26, 2003, Plaintiff was treated by Vicki M. Willey, a nurse practitioner at Tri-State Community Health Center. Plaintiff reported she needed her medications refilled because she had moved to that area from Virginia in October and had been "out of med[s]" for one month. Nurse Practitioner Willey's examination of Plaintiff's chest, lungs, heart, abdomen, and extremities were within normal limits. Plaintiff's neurologic test was normal (R. 166). Nurse Practitioner Willey diagnosed hypertension, back pain, and depression. Plaintiff's HCTZ prescription was refilled.

Nurse Practitioner Willey also prescribed Norvasc and Serafin (R. 167).

On December 26, 2003, Plaintiff underwent laboratory testing at Sacred Heart Hospital, as ordered by Nurse Practitioner Willey. Her cholesterol levels were "desirable" and her and triglyceride level was normal (R. 187).

On December 30, 2003, Plaintiff returned to Nurse Practitioner Willey with complaints of headache with sensitivity to noise and light. Her blood pressure was 170/112. Nurse Practitioner Willey's examination of Plaintiff's eyes, ears, throat, neck, lungs, and heart produced normal results (R. 164). Nurse Practitioner Willey diagnosed headache and hypertension, prescribed HCTZ for Plaintiff's hypertension, and recommended Aleve for Plaintiff's headache (R. 165).

On January 23, 2004, Plaintiff was examined by Nurse Practitioner Willey. Plaintiff reported constipation and shortness of breath. Plaintiff stated she did not exercise. Her weight was stable and she experienced low back pain or "strain" (R. 162). Plaintiff's neck was supple, her lungs were clear, and her extremities were normal (R. 163).

On February 10, 2004, a consultative mental status examination of Plaintiff was completed by Gregory E. Trainor, M.A., for the West Virginia Disability Determination Service. Plaintiff was cooperative. Her psychomotor behavior was mildly deficient in that she had "some slight difficulty in ambulating." Plaintiff informed Mr. Trainor that she was applying for disability because she had "'a lot of back problems . . . a lot of depression, anxiety and stuff.'" Plaintiff stated she lived in Ridgeley, West Virginia, having moved to that location from Virginia "to get out of a bad relationship." Plaintiff informed Mr. Trainor that her "back problems" began "three or four years ago" (R. 125). Plaintiff stated she had experienced depression and/or anxiety symptoms for "10 years or better." Plaintiff stated that "[w]ork interference" was "five years ago when it became

difficult for her." Plaintiff reported her disability date as October, 2003 (R. 126).

Plaintiff informed Mr. Trainor that her presenting symptoms were "back problems," headaches, shortness of breath, depression, and anxiety. Plaintiff stated sitting, standing, or lying down "for too long" caused back pain. Plaintiff stated her headaches began in "October, as she had been beaten and choked by her ex-fiancé." Plaintiff stated her depression manifested itself in her becoming easily upset, her experiencing crying episodes, her having nightmares, and her having difficulty sleeping. Plaintiff stated her anxiety had increased since the physical encounter with her ex-fiancé. Her appetite has decreased, but her weight had increased. Her energy had decreased. Plaintiff stated she had "some suicidal ideations," but no active suicide plans. Plaintiff informed Mr. Trainor she experienced difficulty with her memory and had panic attacks (R. 126).

Mr. Trainor reviewed part of Plaintiff's Social Security Administration disability records; records from Rockingham Memorial Hospital, in Harrisonburg, Virginia; and records from Valley Physicians, in Timberville, Virginia, in making his assessment of Plaintiff. Plaintiff stated she had undergone no mental treatments (R. 126). Plaintiff informed Mr. Trainor she had hypertension and she did not smoke. Plaintiff stated she was a "social drinker" and last drank a month-and-a-half prior to the assessment. Plaintiff stated she had been charged with driving under the influence five years prior to the assessment. Plaintiff informed Mr. Trainor she had graduated from high school and had no learning difficulties. Plaintiff stated she had been last employed in October, 2003, as a housekeeper at a hotel (R. 127). Plaintiff stated she had "looked for work but has not had any luck in getting hired." Plaintiff reported having been divorced twice and the mother of two daughters. Plaintiff stated she did not have any difficulties with family relationships (R. 128).

Plaintiff made good eye contact and gave adequate responses during the interview. Mr. Trainor detected a "slight speech impediment." He opined Plaintiff was oriented "x 4," her mood

6

was anxious, and her affect was "somewhat restricted" (R. 128). Plaintiff's thought process was normal; thought content was without phobias, obsessive-compulsive tendencies, or delusions; perception was without illusions or hallucinations; insight was fair; judgment was within normal limits; immediate memory was mildly deficient; recent memory was normal; remote memory was normal; concentration was moderately deficient; and psychomotor behavior was mildly deficient. Plaintiff admitted to suicidal ideations, but stated she had formulated no plan to commit suicide. She admitted to "thoughts of hurting her ex-boyfriend," but stated she did not "have it in" her to kill anyone (R. 129).

Mr. Trainor's objective findings were "some physical discomfort, depressive features . . ., somewhat restricted affect, anxious features with anxious mood, some memory impairment, impaired concentration, some family dysfunction with a history of abusive relationship, some speech/articulation difficulties and somewhat limited activities." He diagnosed the following: Axis I – major depressive episode, recurrent, moderate; anxiety disorder "NOS (rule out PTSD and or panic disorder)"; pain disorder; and phonological disorder; Axis II – deferred; and Axis III – chronic back pain, high blood pressure, headaches, shortness of breath and weight gain (by self report). Mr. Trainor noted Plaintiff's back pain, coupled with her emotional stressors, namely increased anxiety, depression, and panic attacks after her ex-fiancé physically attacked her that "complicated her condition." His prognosis was "fair to poor" (R. 130).

Plaintiff informed Mr. Trainor that her activities of daily living were as follows: rose from bed, turned on television, drank "something," took medication, retrieved her mother's phone to use while her mother was at work, did laundry, watched television, visited with her sister periodically, went "to town" with her sister periodically, watched television in the evening, and retired (R. 130-

31). Plaintiff cooked three times per week, cleaned once per week, washed dishes three times per week, laundered clothes once per week, grocery shopped once or twice a month, had recently helped her landlord with some shoveling, did not drive, did not walk, and had no hobbies or interests. Plaintiff reported she did not attend church, did not belong to clubs or organization, did not eat in restaurants, visited her mother daily, visited a sister one or two times per week, visited other siblings on holidays or special occasions, visited daughters on holidays, did not socialize with neighbors, and had no contacts with friends (R. 131). Mr. Trainor found Plaintiff could manage benefits, if they were awarded (R. 132).

On February 18, 2004, Plaintiff's lumbar spine was x-rayed. The impression was for a "normal lumbar spine" (R. 138).

On the 18th day of February, 2004, Kip Beard, M.D., completed a consultative internal medicine examination of Plaintiff for the West Virginia Disability Determination Service. Plaintiff's chief complaints were hypertension, shortness of breath, and back pain. Plaintiff informed Dr. Beard she had not required hospitalization for hypertension, had no symptoms associated with hypertension, and was unaware of any end-organ damage due to hypertension. Plaintiff stated she had been "short of breath 'all [her] life.'" She stated she became short of breath "just walking from one room to the next and this [was] worse if she ha[d] to go up steps." Plaintiff informed Dr. Beard she had no significant coughing or wheezing. Plaintiff denied smoking cigarettes. Plaintiff stated she had experienced back pain for "at least the last five years." Plaintiff stated the results of x-rays and CT scans showed she had a "'slipped disc'" (R. 133). Plaintiff informed Dr. Beard she experienced constant lower back pain, which radiated up to her shoulder blades, and she had some numbness in her left leg to her knee. Plaintiff asserted pain increased when she would lie flat, made

8

a bed, bent over, stooped, and sat or stood for prolonged periods. Plaintiff stated she treated her pain with topical ointments, Aleve, and the use of heating pads. Plaintiff listed her medications as Prozac, Norvasc, and Hydrochlorothiazide. Plaintiff stated her "other illness" was depression. Dr. Beard reviewed an "[a]uthorization voucher," range of motion form, disability report (page one of six pages), normal lumbar x-ray from July, 2002, and a patient questionnaire (R. 134).

Plaintiff's blood pressure was 132/80 at the time of the examination (R. 134). Dr. Beard noted Plaintiff ambulated normally, was able to stand unassisted, was able to arise from a seat without difficulty, was able to step up and down from the examination table without difficulty, was mildly uncomfortable when seated, had an occasional mild antalgic lean, was able to speak understandably, and was able to follow instructions without difficulty. Dr. Beard noted the results of Plaintiff's HEENT, neck, chest, cardiovascular, abdominal, extremity, cervical spine, arm, hand, knee, ankle, foot, and neurologic examinations were normal. Dr. Beard found Plaintiff experienced "some mild pain on motion testing with paravertebral and SI tenderness worse on the right" when he examined her LS spine and hips. There was no spasm and her extension and lateral bending were normal. Plaintiff could stand on each leg. Plaintiff's seated and supine straight leg raising tests were ninety degrees with no complaints. There was no tenderness on palpation to Plaintiff's hips, and flexion of her hips were normal bilaterally. Plaintiff was able to heel walk, toe walk, and tandem walk. Plaintiff stated squatting produced some mild low back pain. Dr. Beard's impression was for hypertension, dyspnea, chronic muscular myofacial thoracic and low back pain, and obesity. Relative to Plaintiff's complaints of back pain, Dr. Beard found Plaintiff's neurologic exam was negative for radiculopathy, that her gait was normal without ambulatory aids, her straight leg raising tests were negative, and she had "some mild motion loss and tenderness" upon examination.

9

Relative to Plaintiff's shortness of breath, Dr. Beard opined Plaintiff's lungs were normal "without exertional dyspnea or accessory muscle recruitment" (R. 136). Relative to Plaintiff's hypertension, Dr. Beard noted he "did not appreciate end-organ damage related to this" (R. 137).

On March 5, 2004, Frank D. Roman, Ed.D., completed a psychiatric review technique of Plaintiff. He found Plaintiff had impairments that were not severe, namely affective disorders and anxiety-related disorders (R. 139). Plaintiff's affective disorder was noted as a depressive disorder (R. 140). Dr. Roman found Plaintiff had a mild degree of limitation in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace. Dr. Roman found Plaintiff had not experienced any episodes of decompensation (R. 142).

On March 18, 2004, Plaintiff presented to Nurse Practitioner Willey with complaints of shortness of breath and constipation. Her blood pressure was recorded as 144/90 (R. 159).

On March 24, 2004, Plaintiff had a x-ray made of her chest relative to her shortness of breath. The impression was as follows: "CT scan of the chest has been recommended to evaluate an unusual low density shadow along the right and posterior heart border which may or may not be significant. There is possible mild cardiomegaly noted" (R. 185).

On March 31, 2004, Plaintiff underwent a pulmonary function study for shortness of breath and dyspnea after any exertion (R. 181). The results were "[e]ssentially normal spirometry and flow volume loop" (R. 183).

On March 31, 2004, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours

in an eight-hour workday; and push/pull unlimited (R. 146). Dr. Franyutti found Plaintiff had no postural or communicative limitations (R. 147-48). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation. Dr. Franyutti found Plaintiff was unlimited in her ability to be exposed to extreme heat, wetness, humidity, noise, vibration, and hazards (R. 148). Dr. Franyutti reduced Plaintiff's RFC to medium, due to pain and fatigue (R. 149).

On April 7, 2004, Plaintiff underwent a CT scan of her chest relative to her complaints of shortness of breath. There was "no evidence of axillary, mediastinal, or hilar lymphadenopathy." No "pleural or pericardial effusion" was noted. "Dependant atelectasis [was] present in the lung bases," but "lungs, otherwise, [were] normal." The result was for "an essentially normal CT of the chest" (R. 180).

On April 20, 2004, Plaintiff returned to Nurse Practitioner Willey with complaints of arm numbness and shortness of breath (R. 155). Nurse Practitioner Willey diagnosed hypertension, for which she prescribed Lisinopril; shortness of breath, for which she recommended Plaintiff undergo a stress test and considered prescribing Advair; and arm numbness, for which she referred Plaintiff to TriState Occupational Therapy and prescribed Elavil (R. 156).

Plaintiff presented to Western Maryland Health System for a stress test on April 29, 2004. The myocardial perfusion scan was normal. The stress test was negative for ischemia (R. 176-77).

On June 2, 2004, Plaintiff returned to Nurse Practitioner Willey for treatment of hypertension, shortness of breath, and arm pain. Plaintiff's blood pressure was registered at 126/86, and Nurse Practitioner Willey noted it was "ok." Plaintiff reported her arm pain and back pain continued, but her back pain was not as bad (R. 153). Nurse Practitioner Willey recommended

Plaintiff undergo an echocardiograph relative to her shortness of breath complaints (R. 154).

On June 15, 2004, Plaintiff underwent an echocardiograph. The results were "normal to hyperdynamic left ventricular systolic function" and "the remainder of this study [was] normal" (R. 173).

On June 29, 2004, Plaintiff presented to Nurse Practitioner Willey for treatment for her hypertension, shortness of breath, and arm and back pain. Nurse Practitioner Willey opined Plaintiff's blood pressure was "ok," but that she did experience occasional ankle swelling. Plaintiff informed Nurse Practitioner Willey that her lower back pain was not constant but did occur when she moved from sitting position to standing position, or when she stood too long, or when she walked short distances (R. 151). Nurse Practitioner Willey increased Plaintiff's dosage of Elavil and ordered an MRI of Plaintiff L-spine (R. 152).

On July 6, 2004, Plaintiff underwent a MRI of her lumbar spine for her complaints of low back pain. The impression was for "a mild lumbar degenerative spondylosis/degenerative disc disease"; "L4-L5 tiny posterior annular tear [was] seen to the left of midline"; and "no lumbar HNP" (R. 170-72).

On October 20, 2004, Thomas Lauderman, D.O., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 189). Dr. Lauderman found Plaintiff had no postural limitations (R. 190).

On October 25, 2004, John R. Warfield, M.D., interpreted a x-ray of Plaintiff's chest, which

revealed "no cardiopulmonary abnormality" (R. 202).

On November 1, 2004, Plaintiff returned to Nurse Practitioner Willey with complaints of shortness of breath, hypertension, and back pain. Plaintiff stated her back pain was caused by standing too long and that Elavil was not easing her pain. Plaintiff brought "disability papers" to Nurse Practitioner Willey to complete because Plaintiff asserted she could not work. Plaintiff stated she experienced hand and elbow pain, bilaterally. Plaintiff stated she experienced shortness of breath "even at rest" (R. 198). Nurse Practitioner Willey recommended Plaintiff get a cervical spine x-ray made, instructed Plaintiff to wear wrist splints, and agreed to complete Plaintiff's disability documents (R. 199).

On November 3, 2004, x-rays were made of Plaintiff's cervical spine. The impression was for "no evidence of an osseous injury or focal destruction" and "mild degenerative changes of the lower cervical spine" (R. 197).

On December 13, 2004, Plaintiff was examined by Nurse Practitioner Willey for wrist and back pain, shortness of breath, and asthma. Plaintiff stated her shortness of breath was not successfully treated by any inhaler and became worse with activity. Plaintiff stated she had experienced some improvement to her back pain. Plaintiff's blood pressure was 142/90 (R. 195). Plaintiff's medications were refilled and she was instructed to return in three months (R. 196).

On March 21, 2005, Plaintiff returned to Nurse Practitioner Willey for follow-up examinations for back pain and hypertension. It was noted that Plaintiff had experienced some improvement in her back pain. Plaintiff's blood pressure was 160/84. Plaintiff informed Nurse Practitioner Willey that the Prozac "help[ed]" her depression symptoms (R. 193). Nurse Practitioner Willey changed Plaintiff's hypertension medication, increased Plaintiff's dosage of Prozac, and

13

refilled Plaintiff's medications for her back pain. Plaintiff was instructed to return in six weeks (R. 194).

On July 13, 2005, ALJ Brown conducted an administrative hearing relative to Plaintiff's applications for DIB and SSI (R. 253). At the hearing, Plaintiff testified she lived alone. Plaintiff stated she had a Virginia's driver's license, but did not have a West Virginia's driver's license (R. 257). Plaintiff testified she was five feet, six inches tall and weighed two-hundred and thirty-five pounds (R. 257-58). Plaintiff stated she had weighed two-hundred and eighty-five pounds when she had been employed. Plaintiff stated she quit her "line worker" job because she moved from that location (R. 258-59). Plaintiff testified she had had a housekeeping job at a motel job in Virginia, but had quit that job in October, 2003, due to her leaving that location because her then fiancé physically beat her (R. 259-60). Plaintiff stated she had not experienced any "residuals" from that beating (R. 260). Plaintiff testified she had not sought counseling for her depression but was taking Prozac for that condition. Plaintiff stated she would like to return to work, but she did not "feel [she] could with [her] back and [her] shoulders and [her] feet." Plaintiff testified she rose between 6:30 a.m. to 7:00 a.m., fixed her own meals, grocery shopped when transported by her sister or daughter, had no hobbies or interests, and was not a member of any organization or group (R. 261).

Plaintiff testified she had experienced frequent urination and was to undergo a bladder test (R. 263). Plaintiff stated she had difficulty walking up and down steps, walking "too much," and standing "too much" because of lower back pain. Plaintiff stated the medication she took for her lower back pain caused drowsiness. Plaintiff testified her blood pressure went "up and down" and she experienced light-headedness, which lasted for a few minutes and for which she sat down. Plaintiff testified she had hallucinations, which began six months prior to the hearing, and during

14

which she saw her "grandmother that has passed away" and heard her grandmother "talking to [her], telling [her] . . . what to do." Plaintiff stated Nurse Practitioner Willey recommended she see a therapist for treatment of her hallucinations (R. 265). Plaintiff testified she experienced nightmares about her ex-fiancé. Plaintiff stated she had difficulty breathing, for which she used an inhaler "maybe twice per day." Plaintiff also testified she had been prescribed medication to aide in sleeping (R. 265). Plaintiff stated the sleeping medication helped her sleep for five to six hours per night. Plaintiff testified her back pain did not interfere with her memory or concentration. Plaintiff stated she could stand for forty-five minutes before she needed to change positions and she could sit for forty-five minutes before she needed to change positions (R. 266). Plaintiff stated she could not walk great distances due to her shortness of breath. She testified that weather variations caused her "joints [to] hurt more," but did not exacerbate her breathing condition (R. 267). .

Plaintiff's counsel submitted a January 3, 2005, report form Sarim R. Mir, M.D., relative to his neurological consultation of Plaintiff to the Appeals Council (R. 249-51). Plaintiff's counsel also submitted a February 2, 2005, follow-up report of Dr. Mir (R. 248).

On April 25, 2006, Plaintiff filed her Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment [Docket Entry 6]. In the memorandum, Plaintiff refers to attached exhibits (Plaintiff's brief at pp. 11 and 18). None was attached. On May 19, 2006, Plaintiff, through counsel, filed documents as the exhibits to which she referred in her Memorandum in Support of Motion for Summary Judgment [Docket Entry 8]. That exhibit contained the following:

- July 11, 2005, office notes from Nurse Practitioner Willey. Plaintiff presented for her annual physical examination. It was noted she had a positive history for hypertension, depression, and back pain (Docket Entry 8, p. 11).

15

- July 11, 2005, laboratory results, which noted Plaintiff anemia was "mild" (Docket Entry 8, p. 15).

- July 11, 2005, lipid profile, which noted Plaintiff's triglyceride levels were normal and her cholesterol levels were desirable (Docket Entry 8, p. 16).

- August 5, 2005, results of Plaintiff's transvaginal pelvic sonogram, which showed "normal ovaries," a "likely calcification . . . along the posterior uterine body," no mass, a "thickened and heterogeneous endometrium," and "cysts . . . within the cervix." Carcinoma was not excluded and a clinical correlation was recommended (Docket Entry 8, p. 19).

- September 6, 2005, office notes from Nurse Practitioner Willey. Plaintiff's blood pressure was 122/86. A pap smear was completed (Docket Entry 8, p. 10).

- September 12, 2005, results of Plaintiff's pap smear, which were "negative for intraepithelial lesion and malignancy" (Docket Entry 8, p. 13).

- October 26, 2005, office report from Nurse Practitioner Willey. Plaintiff presented with a lesion on her right, lower leg. Her blood pressure was 130/90. She was instructed to use an inhaler three or four times per week for shortness of breath. All systems reviewed by Nurse Practitioner Willey were normal (Docket Entry 8, p. 7).

- The results of an October 26, 2005, vision test, which noted Plaintiff's near vision as 20/40 in her right eye, 20/30 in her left eye, and 20/40 for both eyes (Docket Entry 8, p. 8).

- The results of an October 26, 2005, audiogram test, which were not interpreted (Docket Entry 8, p. 9).

- October 26, 2005, laboratory results, which showed Plaintiff's blood iron level was "slightly low" and on which was noted Plaintiff should take over-the-counter iron supplements (Docket Entry 8, p. 12).

- November 9, 2005, office report from Nurse Practitioner Willey. Plaintiff presented with a lesion on her right, lower leg. Her blood pressure was 142/82. Examination of her skin, ears, throat, lungs, heart, abdomen, and extremities produced normal results. Nurse Practitioner Willey noted Plaintiff was taking over-the-counter supplements for anemia (R. Docket Entry 8, p. 6).

- November 23, 2005, results of Plaintiff's pelvic sonogram, which showed a "thickened endometrial stripe," "interval development of a physiologic/functional cyst of the left ovary," "small calcified leiomyoma in the posterior aspect of the uterus," and "no free fluid in the cul-de-sac" (Docket Entry 8, p. 17).

16

- December 1, 2005, Physical Residual Functional Capacity Questionnaire, which was completed by Nurse Practitioner Willey. She listed Plaintiff's diagnosis as "lower back pain" and opined Plaintiff's prognosis was fair. Nurse Practitioner Willey noted Plaintiff's pain was sharp, constant, and was exacerbated by sitting, standing, and lying down (Docket Entry 8, p. 1). Nurse Practitioner Willey did not offer an opinion as to whether or not Plaintiff was a malingerer. She found Plaintiff's depression contributed to the severity of Plaintiff's symptoms. Nurse Practitioner Willey did not offer an opinion as to whether or not Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations that were described in the evaluation. Nurse Practitioner Willey found Plaintiff frequently experienced pain that interfered with her attention and concentration and was incapable of even low stress jobs, which was based on Plaintiff "feel[ing] that any minor activity [made] things worse." Nurse Practitioner Willey found Plaintiff could sit and/or stand for twenty minutes at one time (Docket Entry 8, p. 2). Nurse Practitioner Willey opined Plaintiff could sit, stand, and/or walk for less than two hours in an eight-hour workday. She found Plaintiff had to walk for five minutes every twenty minutes, had to shift positions at will, and had to take unscheduled breaks at work. Nurse Practitioner Willey wrote that it was "unknown" how often and how long Plaintiff would have to have unscheduled breaks. Nurse Practitioner Willey found Plaintiff's legs did not have to be elevated and she did not require the assistance of ambulatory aides (R. Docket Entry 8, p. 3). Nurse Practitioner Willey opined Plaintiff could rarely lift less than ten pounds; never lift ten, twenty, or fifty pounds; never twist; never stoop; never crouch; never climb ladders; and never climb stairs (R. Docket Entry 8, pp. 3-4). Nurse Practitioner Willey found Plaintiff had no significant limitations in her ability to repetitively reach, handle or finger. Nurse Practitioner Willey opined Plaintiff's impairments would cause good days and bad days, but wrote it was "unknown" as to how many days Plaintiff would be absent from work due to her impairments (Docket Entry 8, p. 4).

The Appeals Council reviewed the above noted exhibits, and did not reopen the case.[1]

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

---

[1]In a March 27, 2006, letter addressed to David E. Furrer, Plaintiff's counsel, the Appeals Council wrote it had denied a request for a review of the ALJ's September 10, 2005, decision on December 9, 2005, and had received and reviewed "additional evidence concerning this case" (the evidence is that which was contained in Plaintiff's exhibit to her Motion for Summary Judgment and listed above). The Appeals Council "concluded that no change in the prior action [was] warranted" and that the "case [was] now before the district court and no further administrative action [would] be taken pending the court's review" (Docket Entry 14).

regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Brown made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or combination of impairments considered severe based on the requirements in the Regulations (20 CFR §§ 404.1520(c) and 416.920(c)).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Supbart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: Light.

7. The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

8. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

9. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

10. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

11. Although the claimant's non-exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.20, Table 2, Appendix 2, Subpart P, and Regulation No. 4 as a framework for decision-making, as well as the appropriate application of Section 202.00(b), a decision of not disabled may be reached. Examples of such jobs have been discussed above.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)) (R. 25-26).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The opinion of the nurse practitioner, Vickie Wiley [sic], contained in her Residual Physical Functional Capacity Assessment in the exhibits to [Plaintiff's] memorandum was completely disregarded by the Administrative Law Judge which was totally improper and her opinion should be given controlling weight in this case (Plaintiff's brief at p. 18).

2. In concluding that the Plaintiff retained the residual functional capacity to perform a significant range of light work, the Administrative Law Judge failed to evaluate the

Plaintiff's complaints of pain and how that pain impacts on her residual functional capacity and failed to articulate and analyze those complaints of pain as set forth in the guidelines provided under 20 CFR 404.1529 and SSR 96-7p (Plaintiff's brief at p. 20).

Defendant contends: concentration

1.      Nurse Willey's opinion is entitled to no weight.

2.      The ALJ properly evaluated Plaintiff's pain.

## C. Weight Given to Opinions

Plaintiff contends the opinion of Nurse Practitioner Vickie Willey, contained in her Physical Residual Functional Capacity Assessment in the exhibits to [Plaintiff's] memorandum, was completely disregarded by the Administrative Law Judge, and her opinion should be given controlling weight in this case (Plaintiff's brief at p. 18). Defendant contends Nurse Willey's opinion is entitled to no weight.

Before addressing the merits of Plaintiff's argument, the undersigned first establishes the following time line relative to Nurse Practitioner Willey's Physical Residual Functional Capacity Questionnaire because it is apparent from the record that this evidence was not submitted to the ALJ for consideration in making his decision. Additionally, this evidence was not presented to the Appeals Council prior to its decision or even prior to Plaintiff the filing the complaint:

- The ALJ rendered his decision on September 10, 2005 (R. 26).

- The Physical Residual Functional Capacity Questionnaire was completed by Nurse Practitioner Willey on December 1, 2005 (Docket Entry 8-1).

- On December 9, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 7, Docket Entry 14).

- Plaintiff filed her Complaint in this action on January 17, 2006 (Docket Entry 1).

- The Defendant filed her Answer on March 27, 2006 (Docket Entry 5).

20

- On March 27, 2006, the Appeals Council informed Plaintiff's counsel that it had reviewed Nurse Practitioner Willey's Physical Residual Functional Capacity Questionnaire and it did not change their December 9, 2005, decision (See Footnote Numbered 1).

- Nurse Practitioner Willey's Physical Residual Functional Capacity Questionnaire was filed with District Court on May 19, 2006, as an exhibit to Plaintiff's Motion for Summary Judgment, which was filed on April 25, 2006 (Docket Entries 6, 8, and 9).

- The March 27, 2006, letter from the Appeals Council to Plaintiff's counsel relative to its consideration of the Physical Residual Functional Capacity Questionnaire was filed, by Plaintiff, with the District Court on September 14, 2006 (Docket Entry 14).

First, Plaintiff's argument that the ALJ erred by not assigning great weight to the opinion expressed by Nurse Practitioner Willey in the Physical Residual Functional Capacity Questionnaire is without merit. As noted in the above recounted time line, this document was not part of the evidence of record when the ALJ issued his decision because it was created almost three months after the ALJ's decision. Additionally, had the opinions contained in Nurse Practitioner Willey's Physical Residual Functional Capacity Questionnaire been part of the evidence of record before the ALJ when he did make a decision in this case, he would not have had to provide any weight to it at all because a nurse practitioner is not an acceptable medical source.

20 C.F.R. § 416.913 establishes what sources can provide evidence to establish an impairment. It reads:

> "(a) . . . We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). . . . Acceptable medical sources are:
> (1) Licensed physicians (medical or osteopathic doctors);
> (2) Licensed or certified psychologists. . . .
> (3) Licensed optometrists . . . .
> (4) Licensed podiatrists . . . .
> (5) Qualified speech-language pathologists . . . ."
> (d) Other sources. In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we *may* also use evidence from other sources to show

the severity of your impairment(s) and how it affects your ability to work or, if you are a child, how you typically function compared to children your age who do not have impairments. Other sources include, but are not limited to –
(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners . . . (emphasis added).

See also 20 CFR 404.1513(d)(1); 404.1527(a)(2); 416.927(a)(2).

Nothing in this regulation requires an ALJ to consider the opinion of a nurse practitioner.

Additionally, the Fourth Circuit, in *Lee v. Sullivan*, 945 F.2d 687, 691 (1991), has held that those

other than "an 'acceptable medical source'" do "not qualify . . . to make a 'medical assessment' on

a Social Security claimant's 'ability to do work-related activities such as sitting, standing, moving

about, lifting, carrying, handling objects, hearing, speaking and traveling'" and their "assessment

can qualify only as a layman's opinion." Substantial evidence supports the ALJ's decision relative

to Nurse Practitioner Willey's opinion contained in her December 1, 2005, Physical Residual

Functional Capacity Questionnaire because it did not exist at the time the ALJ rendered his decision

and an ALJ does not have to assign any weight to the opinion of a nurse practitioner because a nurse

practitioner is not an acceptable medical source.

Second, it is noted that Plaintiff did not argue that the Appeals Council failed to properly

consider the evidence submitted to it after the ALJ issued his decision; however, the undersigned

will address the Appeals Council treatment of the evidence submitted to it by Plaintiff's counsel after

the Appeals Council December 9, 2005, denial of Plaintiff's request for review.[2]   In *Wilkins v.*

---

[2]The undersigned is perplexed as to why Plaintiff submitted evidence to the Appeals Council after it denied Plaintiff's request for review and after Plaintiff appealed Defendant's decision to the District Court; nonetheless, the Appeals Council, in a letter to Plaintiff's counsel dated March 27, 2006, acknowledged receipt of Nurse Practitioner's Physical Residual Functional Capacity Questionnaire, and informed Plaintiff that "no change in the prior action [was] warranted" thereby. The undersigned, therefore, will examine this evidence as new and material.

*Secretary*, 953 F.2d 93 (1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins, supra,* further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new
> evidence would have changed the outcome.

*Id.* at 96.

The Physical Residual Functional Capacity Questionnaire related to the period on or before the date of the ALJ's decision as it reflected Nurse Practitioner Willey's opinion based on her having treated Plaintiff since December 26, 2003 (Docket Entry 8). The Physical Residual Functional Capacity Questionnaire is not new. The evidence of record does not contain another questionnaire; however, the evidence of record does contain the opinions of treating, examining, or consultative physicians which addressed the issue of Plaintiff's limitations and abilities. Specifically, the ALJ relied on the opinions of Mr. Trainor, Dr. Beard, the state agency physicians, and those physicians at the Hahn Medical Practices in determining Plaintiff's RFC (R. 18-19, 22). Mr. Trainor found "no marked or extreme functional limitations" as to Plaintiff's mental status. He stated that Plaintiff's social functioning was mildly deficient with concentration moderately deficient; persistence was within normal limits and pace was mildly slow. Plaintiff was capable of handling her own funds (R. 22). The ALJ noted Dr. Beard found Plaintiff's extremities, cervical spine, arms, elbows, wrists, hands, grasping, knees, ankles, and feet were normal. Dr. Beard opined Plaintiff's neurological examination was normal and intact without any radiculopathy; she had no spasm with flexion,

extension, and lateral bending; Plaintiff's lumber spine x-ray was normal; her straight leg raising test was ninety degrees bilaterally with no complaints of pain, her hips were normal, and Plaintiff had mild pain on motion testing of the lumbar spine (R. 19). The ALJ also considered the March 31, 2004, opinion of the state agency physician, who opined Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; could sit, stand and walk for about six hours in an eight-hour workday; and should avoid concentrated exposure to extreme cold, fumes, dust, odors, gases, and poor ventilation. The ALJ also relied on the October 20, 2004, opinion of the state agency physician who found the same limitations as the March 31, 2004, state agency physician, absent the environmental limitations (R. 22). Finally, the ALJ considered and evaluated the opinion of the state agency psychologist, who found, on March 5, 2004, that Plaintiff had no marked or extreme functional limitations and her activities of daily living, social functioning, and concentration, persistence or pace were mildly limited (R. 23).

Most important, Nurse Practitioner Willey's opinion, contained in that Physical Residual Functional Capacity Questionnaire, is not material because it would not have changed the outcome of the decision rendered by the ALJ in that a nurse practitioner is not an accepted medical source and is not qualified to make a medical assessment of Plaintiff's ability to do work. The ALJ noted in his decision that "a Family Nurse Practitioner (FNP) cannot provide a medical opinion" and the opinions thereof are "not entitled to controlling weight (404.1513 and 416.913)" (R. 18). The undersigned finds substantial evidence supports the Appeals Council's determination that the Physical Residual Functional Capacity Questionnaire would not change the prior administration action.

Finally, Plaintiff did not argue Nurse Practitioner Willey's Physical Residual Functional

24

Capacity Questionnaire was new and material evidence to the Court; nonetheless, the undersigned opines that, for the same reasons stated in the analysis of the Appeals Council's consideration of this evidence, the evidence is rejected as new and material.

For the above stated reasons, the undersigned finds the ALJ was supported in his decision in not assigning weight to the opinion of the nurse practitioner who treated Plaintiff.

### D. Plaintiff's credibility

Plaintiff argues that the ALJ "failed to evaluate the Plaintiff's complaints of pain and how that pain impacts on her residual functional capacity" and failed to articulate and analyze those complaints of pain as set forth in the guidelines provided under 20 CFR 404.1529 and SSR 96-7p (Plaintiff's brief at p. 20). Defendant asserts Plaintiff's contention that the ALJ failed to follow the two-step evaluation process mandated in *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996), is erroneous (Defendant's brief at p. 7).

In *Craig, supra*, the Fourth Circuit developed the following two-step process for determinating whether a person is disabled by pain or other symptoms:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence,"

including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra,* at 594.

The ALJ in the instant case found the following: "The evidence supports a finding that [Plaintiff] has disorders of the back (discogenic and degenerative) and affective disorder, impairments which cause significant vocationally relevant limitations" and "the claimant has impairments that are reasonably expected to produce the type of pain she alleges" (R. 17, 23). The undersigned finds the ALJ fully complied with the first threshold step in *Craig;* therefore, the ALJ was required to evaluating Plaintiff's complaints of pain in conformance with step two of *Craig.*

In conducting step two of the analysis, the ALJ found Plaintiff's "statements concerning her impairments and their impact on her ability to work [were] generally not credible in light of the degree of medical treatment required, discrepancies between the [Plaintiff's] assertions and information contained in the documentary reports, and the reports of the treating and examining practitioners" (R. 21). Additionally, in his findings, the ALJ wrote: "The undersigned finds the [Plaintiff's] allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision" (R. 25). Plaintiff contends the ALJ "fail[ed] to set forth any analysis as to this conclusion," thereby failing to comply with SSR 96-7p (Plaintiff's brief at p. 22), which mandates the following:

> 5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

A review of the ALJ's decision finds he complied with the mandates contained in step-two of the *Craig* credibility analysis in that he thoroughly considered Plaintiff's medical history, results of laboratory findings, objective medical evidence of record, medical treatment used to alleviate Plaintiff's pain, Plaintiff's activities of daily living, and Plaintiff's statements relative to her pain. Additionally, the ALJ's decision contained "specific reasons for the finding on credibility" as required is SSR 96-7p.

The ALJ considered Plaintiff's medical history. He evaluated Plaintiff's non-severe impairments of hypertension, left arm and shoulder pain, hand and wrist pain, headaches, and shortness of breath. He made specific findings as to their effects on Plaintiff's ability to do work and the degree of limitations they caused (R. 17). The ALJ considered Plaintiff's history of epigastric pain and noted that condition was successfully treated with Prevacid (R. 18). The ALJ considered the symptoms of Plaintiff's affective disorder and noted the mild effects that disorder caused to Plaintiff (R. 18-19). The ALJ evaluated Plaintiff's medical history relative to her back condition (R. 19).

In addition to thoroughly considering and evaluating Plaintiff's medical history, the ALJ also considered the results of various laboratory findings relative to Plaintiff's complaints as they apply to her back and affective disorder. The ALJ considered and evaluated the July 25, 2002, lumbar spine series, which revealed no fractures, no subluxation, and normal disc spacing (R. 18). The ALJ noted the following: Plaintiff's CT scan was normal; Plaintiff's pulmonary function study showed normal spirometry and flow volume; Plaintiff's myocardial perfusion scan was normal; Plaintiff's

echocardiograph was normal; and Plaintiff's lumbar spine MRI showed mild lumbar degenerative spondylosis, degenerative disc disease, no herniated nucleus pulposus, and a tiny posterior annular tear at the L4-5. The ALJ considered Plaintiff's November 3, 2004, cervical spine x-ray, which indicated "mild degenerative changes of the lower cervical spine with no evidence of osseous injury or focal destruction" (R. 20).

In conformance with the mandates of step-two of the *Craig* analysis, the ALJ also considered and evaluated the objective medical evidence of record. The ALJ noted Plaintiff's August 6, 2001, physical examination was unremarkable, except for breath sounds over the lobes of Plaintiff's lungs and some crackling in the lower left lobe. The ALJ considered Plaintiff's March 21, 2002, physical examination was unremarkable, except for a diagnosis of hypertension. The ALJ noted Plaintiff's July 18, 2002, physical examination was unremarkable, except for a few crackles in her lungs. The ALJ considered Plaintiff's November 19, 2003, physical examination, which was unremarkable and at which Plaintiff stated she felt better. The assessment was for improved depression (R. 18).

In his analysis of the objective medical evidence relative to Plaintiff's complaints of pain, the ALJ considered the opinion of Dr. Beard, who found Plaintiff had hypertension, dyspnea of unknown etiology, chronic muscular myofascial thoracic and low back pain, and obesity. The ALJ considered Dr. Beard's opinion that Plaintiff ambulated normally, had a mild left antalgic lean, was uncomfortable in the supine position with back pain, had mild pain on range of motion testing in her lumbar spine, had no spasm, had a straight leg raising test at ninety degrees bilaterally, and had a normal neurological examination (R. 19).

The ALJ considered the office visit notes from Tri-State Community Health Center from December 26, 2003, through June 29, 2004, wherein it was recorded that Plaintiff's physical

examinations were "essentially unremarkable" (R. 19). The ALJ noted Plaintiff's November 1, 2004, and March 21, 2005, physical and neurological examinations by Nurse Practitioner Willey were unremarkable (R. 18).

The ALJ considered and evaluated the medical treatment used to alleviate Plaintiff's pain. He noted that on August 6, 2001, Plaintiff reported "doing well on Prozac" (R. 18). He noted Plaintiff was medicated with HCTZ 12.5mg, Norvasc 5mg, Prevacid, and Lisinopril 20/25mg (R. 18, 20).

In analyzing Plaintiff's complaints of pain, the ALJ considered her activities of daily living. He noted that Mr. Trainor found Plaintiff's activities of daily living were within normal limits, and on March 5, 2004, a state agency physician found Plaintiff's activities of daily living were mildly limited (R. 19, 23). The ALJ considered and evaluated Plaintiff's statements at the administrative hearing relative to her activities of daily living, which were as follows: rose at 7:00 a.m., prepared meals, and shopped with her sister or daughter. He noted Plaintiff testified she was not involved in any activities or meetings, stated her longest recent trip was to Morgantown, West Virginia, to see a physician, stated she would like to return to work but "did not think she could do so," and testified she had not attempted to become employed because she lacked transportation (R. 22).

The ALJ considered and evaluated Plaintiff's statements relative to her complaints of pain. Plaintiff testified she "could not do much around the house due to back and shoulder pain." Plaintiff stated the blood pressure medication she took caused lightheadedness and dizziness and also caused her to nap up to one hour per day. Plaintiff stated she slept for up to six hours per night and that her breathing condition was effectively treated by an inhaler. Plaintiff testified "her pain [was] a sharp pain that [was] present most of the time," but it did not interfere with her concentration. The ALJ

noted Plaintiff testified she had had a hallucination, which involved her "deceased grandmother telling her to do things" (R. 21). The ALJ considered and weighed Plaintiff's statements that climbing stairs caused pain, she could stand and sit for up to forty-five minutes without pain, walking even short distances caused her to become short of breath, joint pain was caused by changes in the weather, and her breathing condition was constant (R. 22).

Relative to Plaintiff's statements, the ALJ found the following: "It is recognized that the [Plaintiff] may experience some degree of pain and discomfort. However, mild-to-moderate pain or discomfort is not, in itself, incompatible with the performance of sustained work activity. Neither objective medical evidence nor the testimony of the claimant establishes psychological or physiological abnormalities that would preclude all types of work activity. So, while the [Plaintiff] has impairments that are reasonably expected to produce the type of pain she alleges, her complaints suggest a greater severity of symptoms than can be shown by the objective medical evidence alone" (R. 23).

Specifically, the ALJ found Plaintiff's statements were inconsistent with findings by state-agency physicians and Mr. Trainor.

- On March 5, 2004, a state agency psychologist, Dr. Roman, found Plaintiff had no marked or extreme functional limitations and that her activities of daily living, social functioning, concentration, and persistence or pace were mildly limited (R. 23).

- On March 31, 2004, Dr. Franyutti, a state agency physician, found Plaintiff could lift and or carry fifty pounds occasionally and twenty-five pounds frequently; could sit, stand and walk for about six hours in an eight-hour workday; should avoid concentrated exposure to extreme cold, fumes, dust, odors, gases, and poor limitations. The ALJ noted no other restrictions were found by Dr Franyutti.

- On October 20, 2004, a state agency physician, Dr. Lauderman, found Plaintiff could lift and or carry fifty pounds occasionally and twenty-five pounds frequently and could sit, stand, and walk for about six hours in an eight-hour workday. The ALJ recognized Dr. Lauderman found Plaintiff had no further restrictions (R. 22).

- The ALJ considered and evaluated the objective medical evidence offered by Gregory Trainor on February 10, 2004, relative to Plaintiff's mental status. He noted Mr. Trainor found Plaintiff to be attentive and cooperative, made good eye contact, made adequate responses and was oriented times four. He noted Mr. Trainor's opinion that Plaintiff's mood was "a bit anxious" and her affect was restricted (R. 18). The ALJ considered Mr. Trainor's opinion that Plaintiff's thought processes were normal and her stream of though was organized (R. 18-19). The ALJ noted Mr. Trainor's opinion that Plaintiff had no phobias, obsessional-compulsive tendencies, delusional thinking, illusions, and hallucination and that her Insight was fair, judgment was normal, mildly deficient immediate memory, normal recent and remote memory, mildly deficient concentration, and mildly deficient psychomotor behavior. The ALJ considered Mr. Trainor's diagnoses of major depressive episode (recurrent and moderate), anxiety disorder – NOS, and chronic pain disorder (R. 19).

The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about the medical history and treatment, are important in the evaluation of credibility, as is the consistence of the individual's own statements. *See* SSR 96-7p. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. The ALJ in this case found that "[a]lthough the claimant allege[d] that she [was] disabled and totally unable to work, the evidence showed otherwise (R. 23). The undersigned finds the inconsistencies in Plaintiff's testimony and the evidence of record, which included the above-recited medical history, laboratory findings, objective medical evidence of record, medical treatment used to alleviate Plaintiff's pain, support the ALJ's determination that Plaintiff was less than entirely credible.

Finally, Plaintiff argues the ALJ "totally discounted the Plaintiff's significant complaints of pain as referenced not only in her testimony during the hearing but also in her Daily Activities Questionnaire and her Pain Questionnaire and as reflected by the opinion of nurse practitioner Wiley [sic] regarding the impact of her pain on her concentration and overall functioning" (Plaintiff's brief

at p. 21). As to the Plaintiff's allegations that the ALJ erred in discounting the "opinion of nurse practitioner Wiley [sic] regarding the impact of her pain on her concentration and overall functioning," that opinion was found in Nurse Practitioner Willey's December 1, 2005, Physical Residual Functional Capacity Questionnaire. The undersigned finds the ALJ did not err in his treatment of that document because that document was not part of the evidence of record when he made his September 10, 2005, decision in this case.

The undersigned finds the ALJ did not err in not including an analysis of Plaintiff's December 18, 2003, Activities of Daily Living Questionnaire and December 18, 2003, Pain Questionnaire. Plaintiff's statements at the hearing revealed an ability to do fewer daily activities than she had indicated in those questionnaires, and those were the statements the ALJ considered. Specifically, Plaintiff wrote in the Activities of Daily Living Questionnaire that she experienced some difficulty sleeping at night; she needed no assistance with her personal needs and grooming; Plaintiff's ability to prepare meals was not changed by her condition; her weight had not changed with the onset of her symptoms; Plaintiff did laundry, vacuumed, mopped floors, washed dishes, and removed garbage from her home with no assistance; she shopped for food for about one hour each week, which had not changed since the onset of her condition; Plaintiff read the newspaper for one hour, watched television for four hours, and listened to the radio for one hour each day, activities which had not been altered by her symptoms; Plaintiff received visits from relatives and friends for up to one-half to one hour at a time; Plaintiff wrote her social activities had not changed with the onset of her condition; Plaintiff wrote she had no problems getting along with other people; Plaintiff had no problems with concentration; Plaintiff's completion of tasks, chores, or recreational activities was interrupted, but not suspended, because of back pain or fatigue; Plaintiff had no difficulty

following written or spoken instructions, concentrating, or completing tasks (R. 79-83).

Additionally, Plaintiff's statements at the hearing were that her pain was more debilitating than she expressed in her answers to the questions on the Personal Pain Questionnaire. The ALJ considered Plaintiff's hearing statements. In the Questionnaire, Plaintiff wrote she was in constant pain; standing made the pain worse; her pain was present if she sat, stood, or lay down; she relieved her pain by sometimes taking over-the-counter medication once a day; Plaintiff's pain was in her leg; Plaintiff described her pain as aching and throbbing; Plaintiff wrote she experienced pain once per week for one hour; and Plaintiff described her pain as "so-so" (R. 75-78).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The undersigned finds substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's complaints of pain and other functional limitations.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _6_ day of _November_ , 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE